

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 7, 2022**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| JSAA REALTY, LLC | § § | Case No. 20-32504 |
| Debtor. | § § § § | |
| JSAA REALTY, LLC, | § § | |
| Plaintiff, | § § | |
| v. | § § § | Adv. Pro. No. 21-3042 |
| HAK MAN LEE TRUST, | § § | |
| Defendant. | § § | |

### AMENDED MEMORANDUM OPINION AND ORDER DETERMINING
### HAK MAN LEES TRUST'S CLAIM AGAINST THE DEBTOR[1]

_____

[1] This Amended Memorandum Opinion and Order is filed pursuant to Rule 60 of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure on the Court's own motion and wholly replaces and supersedes ECF No. 30.

The Court conducted a trial on the Complaint for Determination of Claim (the "**Complaint**") filed by Debtor-Plaintiff JSAA Realty, LLC (the "**Debtor**") against Defendant Hak Man Lee Trust (the "**Trust**," and, together with the Debtor, the "**Parties**").  By its Complaint, the Debtor seeks a determination of the Trust's claim against the Debtor for purposes of confirmation. The Debtor alleges that, through its Proof of Claim (as defined below) filed in the related bankruptcy case, the Trust overstated its claim against the Debtor and requests that the Court enter a judgment reducing the Trust's claim.

The Trust denied the factual basis for the Complaint and asserted the following affirmative defenses in its Answer to the Complaint (the "**Answer**"): (1) mutual mistake; (2) estoppel; (3) unclean hands; (4) ratification; and (5) laches.

The Court has considered the pleadings and all briefing filed in this adversary proceeding, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel.  The following constitutes the Court's findings of fact and conclusions of law[2] in support of its ruling as required under Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

As will be set forth more fully below, the Court finds and concludes that the Trust holds an allowed secured claim against the Debtor as of the Petition Date (as defined below) in the amount of $495,083.82.

## I.    Jurisdiction and Venue.

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  The bankruptcy court has authority

---

[2] Any finding of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

to adjudicate this matter pursuant to the United States District Court for the Northern District of Texas Miscellaneous Order No. 33.  Both Parties have consented to this Court hearing this matter and determining the issues on a final basis.

## II.     Procedural Posture

On November 5, 2020, Sunshine Metro Investments, LLC ("**Sunshine**") filed Proof of Claim No. 2-1 (the "**Proof of Claim**"), stating a claim against the Debtor in the amount of $491,022.94 secured by a mortgage on the Debtor's real property located at 11505 Anaheim Dr., Dallas, TX 75229.  On November 24, 2020, Sunshine filed an amended Proof of Claim, stating a claim against the Debtor in the amount of $491,256.51.  On December 1, 2020, Sunshine filed its Transfer of Claim Other than for Security (the "**Claim Transfer**"), in which Sunshine gave notice that it had transferred its claim to the Trust.  The Trust amended the Proof of Claim again on March 31, 2021, stating that it held a claim against the Debtor in the amount of $510,647.87, as a result of acquiring Dallas County's tax claim against the Debtor in the amount of $19,391.96.[3]

On April 27, 2021, the Debtor filed its Objection to the Proof of Claim, which was subsequently converted to an adversary proceeding by agreement of the Parties on June 29, 2021. The Trust timely filed its Answer on July 28, 2021.  The Trust filed its Proposed Findings of Fact and Conclusions of Law and its Trial Brief on September 23, 2021.  The Court held a trial beginning on September 30, 2021.  Prior to the close of evidence, on October 5, 2021, the Trust filed its Motion to Strike Testimony, in which it requested that the Court strike the entirety of the testimony of Andy Sinkular and Arpit Joshi, the sole members of the Debtor, due to alleged violations of 18 U.S.C. § 1623 and 18 U.S.C. §§ 152(3), 157(3), and 1621.  For the reasons set

---

[3] The Trust's acquisition of Dallas County's tax claim has not been disputed in this case.  As such, the remainder of these Findings of Fact and Conclusions of Law will focus on the Trust's asserted claim transferred by Sunshine.  The Trust also acquired the claim of Home Tax Solutions, originally filed as Proof of Claim No. 3-1, in the amount of $21,091.68.  [ECF No. 47.]  The Debtor likewise did not dispute the Trust's acquisition of Home Tax Solutions' claim.

forth below, the Motion to Strike Testimony is denied in toto.[4]  The trial ultimately concluded on

October 6, 2021, and the Court took the matter under advisement.

**III.**    **Findings of Fact**

**A. The Parties**

The Debtor is a limited liability company formed under the laws of the state of Texas in

2016.  The Debtor was formed to take ownership of and collect rent on account of a piece of real

property located at 11505 Anaheim St., Dallas, TX 75229 (the "**Property**").  Mr. Sinkular and Mr.

Joshi (collectively, the "**Members**") both own 50% of the membership interests in the Debtor.  At

the time of the trial, Mr. Joshi testified that he was the Debtor's Vice President, and Mr. Sinkular

testified that he was the Debtor's President.

The Trust is an entity somewhat shrouded in mystery, even after a trial spanning nearly

three full days.  Through testimony at the trial, the Court learned that Selim Taherzadeh, who is

also counsel-of-record for the Trust, serves as the Trust's trustee.  The Trust's beneficiary is

Viceroy Investments, a commercial real estate firm located in Dallas.  No other information about

the Trust has been forthcoming.

**B. Factual Background**

In 2004, the Members formed an entity called JSAA Enterprises, Inc. ("**Enterprises**") for

the purpose of acquiring the Property and operating an adult video store on the premises.

Enterprises operated successfully for a number of years prior to a downturn in their business

beginning around 2008.  By 2011, the adult DVD sales market had become so depressed that the

Members made the decision to begin renovating the Property with the ultimate goal of converting

it from a video store/theater to an adult cabaret or night club.  The Members invested substantial

---

[4] The Court entered its Order Denying the Trust's Motion to Strike Testimony contemporaneously herewith.

sums of their personal financial resources to that end.  By 2016, however, the Members had largely depleted their own resources and, therefore, began seeking additional financing to complete the renovation of the Property.

Pawan Bagaria, Enterprises' external accountant, referred the Members to Sunshine as a potential lender.  After negotiating with Sunshine, the Members formed the Debtor and transferred ownership of the Property from Enterprises.  Thereafter, on November 16, 2016, the Debtor and Sunshine executed a promissory note (the "**Original Note**") pursuant to which Sunshine lent $300,000.00 to the Debtor.  The Debtor, in return, agreed to make monthly, interest-only payments at an 8% annual interest rate beginning on December 1, 2016, and continuing through May 1, 2017.  Thereafter, the Original Note provided that payments would be made according to an amortization schedule purportedly attached thereto.  The testimony at trial was inconclusive with regard to whether the amortization schedule was attached to the Original Note.  Nevertheless, the Original Note provided that its maturity date was June 1, 2022, and that any unpaid principal balance remaining would be due on that date.  As collateral for the loan contemplated in the Original Note, the Debtor executed a Deed of Trust granting Sunshine a security interest in the Property.

The Debtor commenced interest-only payments on December 1, 2016.  Mr. Joshi testified that he made the payments to Mr. Bagaria in person at a coffee shop via cash or check.[5]  The payments were not documented by either party.  The Debtor made each of the required interest-only payments through May 1, 2017, at which point principal payments also became due.  The

---

[5] Over the course of the trial, there existed tremendous disputes between each of the witnesses as to the timeliness (and, on occasion, the occurrence) of payments and the transactional history of the relationship between the Debtor and Sunshine pursuant to the Original Note.  As will become evident below, however, many of these findings of fact are in the nature of narrative background and ultimately immaterial to the Court's Conclusions of Law.  Thus, the Court will endeavor to present the most cogent factual history possible, piecing together what most likely occurred based on significantly disparate recollections of primarily oral communications.

Debtor thus began making payments of $2,506.00 for the remainder of 2017. Additionally, sometime in June 2017, Sunshine advanced an additional $50,000.00 to the Debtor to further assist with renovation costs.[6]

Beginning in 2018, the evidence reflected that Mr. Bagaria shepherded the process of Enterprises applying for a loan from Commonwealth Business Bank ("**CBB Bank**"), which would allow for the refinancing of the Original Note as well as an additional infusion of capital to push the renovation project to completion. On March 21, 2018, CBB Bank delivered a letter of intent (the "**LOI**") to Enterprises stating that it was interested in pursuing the Debtor's credit request for $1.2 million. While the application process was ongoing, the Debtors ceased making payments under the Original Note. On or around July 3, 2018, Mr. Bagaria submitted a letter (the "**Payoff Letter**") to CBB Bank, ostensibly as part of the application process. The Payoff Letter was signed by Raja Doddi, as managing member of Sunshine, and purported to show the payoff amount for the Original Note. The Payoff Letter listed the principal amount as $350,000.00 with an annual interest rate of 9%. Furthermore, the Payoff Letter purported to show that no principal payments had been made (*i.e.*, the principal amount outstanding was listed as $350,000.00) and that "[i]nterest and other fee[s]" outstanding "till [sic] 7/31/2018" were $11,125.00, resulting in a total payoff amount of $361,125.00. Neither of the Members recalled seeing or receiving the Payoff Letter. Thereafter, sometime in August of 2018, CBB Bank declined to extend a loan to the Debtor. Upon this denial, Mr. Joshi testified that the Debtor resumed payments pursuant to the Original Note and brought the loan current by November of 2018.

The Debtor again ceased making payments to Sunshine in early 2019, purportedly on instruction of Mr. Bagaria, the Parties' intermediary, while the Debtor pursued negotiating a new

---

[6] The Court notes that there was considerable disagreement between the Parties as to the interest rate on the newly advanced funds. It is irrelevant to the instant dispute.

loan from Sunshine. The negotiations occurred primarily through the Members and Mr. Bagaria on behalf of Sunshine. At some juncture, Mr. Bagaria proposed that the Debtor and Sunshine enter into a sale-leaseback agreement through which the Debtor would convey the Property to Sunshine, who would then lease the Property to the Debtor, in exchange for an additional infusion of capital to facilitate the ongoing renovations. The Debtor declined the sale-leaseback offer.[7] Negotiations continued regarding a traditional loan in the amount of approximately $1.2 million with graduated interest over the life of the loan. This arrangement was also never consummated.

Negotiations between the Debtor and Sunshine continued until approximately June of 2019, at which point they ceased without agreement between the Debtor and Sunshine. On June 10, 2019, the Debtor received a letter (the "**Default Notice**") from Ramirez & Associates P.C., counsel to Sunshine, purporting to notify the Debtor that it was in default under the Original Note in the amount of $32,617.00, representing thirteen missed payments of $2,509.00 beginning from June 1, 2018. The Default Notice further noted that Sunshine had advanced a total of $95,000.00 at various times since 2017,[8] which Sunshine requested to be memorialized through execution of an amendment to the Original Note. Notably, the Default Notice listed the Debtor, Enterprises, and Mr. Joshi, specifically, as recipients, but not Mr. Sinkular, who credibly testified at trial that he did not receive this letter until much later.

After receipt of the Default Notice, Mr. Joshi began working directly with Mr. Bagaria to remedy the alleged default. On June 21, 2019, Mr. Bagaria sent an email (the "**June 21 Email**") to the Members stating the following:

---

[7] Mr. Sinkular testified that a sale-leaseback transaction was never a legitimate transactional option for the Debtor.
[8] The Default Notice noted the following advances: $50,000.00 in 2017, $15,000.00 in 2018, $25,000.00 in April of 2019, and $5,000.00 in May of 2019. The evidence made clear that the aforementioned advances were not all necessarily advanced by Sunshine but rather, in some instances, by other individuals or entities, including, but not limited to Mr. Bagaria.

Attached the new note amount. We are going to pay additional $2500 to attorney for drafting the new note and trust deed and all other guaranty forms. I will appreciate it you guys reimburse that amount in cash/check. Will do the signature on Monday at attorney's place.

Attached to the June 21 Email was a spreadsheet purporting to show a "Total New Note" of $395,000.00, and a past due amount of $67,425.00.[9] The spreadsheet therefore showed a total outstanding and due to Sunshine of $462,425.00. Finally, the spreadsheet contained three lines of text: (1) "The new note will have interest only for 6 month @ 10%"; (2) "Interest due from Jul[y] 1st 2019"; and (3) "Amortization for 20 years and to be ballooned in 3 years time." Mr. Bagaria also attached a PDF to the June 21 Email consisting of an invoice from Ramirez & Associates, addressed to "VenSan Investments, LLC," detailing legal fees incurred in the amount of $5,570.00.

Thereafter, on June 26, 2021, Mr. Bagaria sent an email (the "**June 27 Email**") to Mr. Doddi, Mr. Joshi, and Anish Patel, an attorney with The Patel Law Group. Mr. Sinkular was not a recipient of, nor copied on, the June 27 Email. Attached to the June 27 Email were a number of documents, the most important of which bore the filename "First Amendment to Promissory Note.PLGv1 – JSAA Realty.docx."[10] That attachment consisted of an undated, unexecuted "First Amendment to Promissory Note" (the "**Amended Note**"). The Amended Note, in its Recitals, referenced the Original Note, dated November 16, 2016, and stated that the Debtor and Sunshine desired to amend the Original Note. The form of the Amended Note had a stated a principal amount of $465,000.00 and increased the applicable annual interest rate to 10%. The Amended Note also stated that the payment terms would be amended and that interest only payments would

---

[9] The past due amount was comprised of fourteen monthly payments of $2,625.00 beginning from May of 2018, two charges of $337.50 (interest on an "additional amount" of $45,000.00 at 9%), $25,000.00 representing "[r]educed late fee and charges as decided," and $5,000.00 for attorneys' fees.

[10] The other attachments were likewise entitled as amendments to various other loan documents including an Assignment of Rents, a Deed of Trust, and two guaranties. These documents have very little, if any, relevance to these Findings of Fact and Conclusions of Law.

commence on July 1, 2019 until December 1, 2019, at which point principal and interest payments would commence pursuant to a purportedly attached amortization schedule for a period of three years.[11]  At the expiration of the three-year period, the Amended Note provided that all unpaid principal and any accrued, unpaid interest would be come due in full.  The Amended Note contained a signature block for each of the Members and for Mr. Doddi on behalf of Sunshine.

After delivery of the June 27 Email, the timeline of this case becomes somewhat inscrutable.  On July 2, 2019, Mr. Joshi sent an email (the "**July 2 Email**") to Mr. Doddi and Mr. Bagaria.[12]  The subject of the email was "Document.pdf/ new contract."  Attached to the email were the following documents: (1) First Amendment to Assignment of Rent; (2) First Amendment to Deed of Trust; and (3) First Amendment to Guaranty.  Each of these documents bears a signature for each of the Members and a notarial seal.  The notarial seal, however, in each instance provides that the documents were "[n]otarized for Arpit Joshi."  At trial, Mr. Joshi sadly admitted to forging Mr. Sinkular's signature on each of these documents, thereby explaining why each document was only notarized with regard to Mr. Joshi's signature.  The signatures on the First Amendment to Assignment of Rents and First Amendment to Guaranty indicate that the documents were executed on July 2, 2019.  The signatures on the First Amendment to Deed of Trust were not dated.

Importantly, the Amended Note was *not* attached to the July 2 Email.  A significant dispute at trial revolved around the date on which Mr. Joshi signed the Amended Note.  The Trust alleges that the Amended Note was executed in July of 2019 with the other amended documents discussed

---

[11] The Trust included in its Witness and Exhibit List a document the Trust alleged to be the amortization schedule attached to the Amended Note.  The Debtor objected to admission of that document in the Joint Pretrial Order.  ECF No. 19 at 4 (objecting to admission of Exhibit 18).  At trial, counsel for the Trust briefly questioned Mr. Joshi regarding the document, and the Debtor re-urged its objection to admission of the document.  The Trust made no further argument for its admission and thus the document was not admitted as evidence into the record. Although the documentary evidence did not uncover an actual copy of the amortization schedule, the Parties agreed that it was a 20-year amortization at 10% interest.
[12] Mr. Sinkular was not a recipient of nor copied on the email.

above.  The Trust supports this assertion with a check, dated July 3, 2019, in the amount of $3,875.00 made payable to Sunshine and indicating that it was drawn for an "interest payment." The Trust further asserts that $3,875.00 is the exact amount of an interest only payment under the terms of the Amended Note.[13]  Strangely, however, on August 4, 2019, the Debtor made a withdrawal from the Bank of Texas in the amount of $4,000.00, the stated purpose of which was a "Sunshine Metro Note" payment.[14]

The Debtor, however, argues that the Amended Note was not executed until July of 2020, at which point Mr. Joshi, as he did with the other amended documents, signed his own name and, without Mr. Sinkular's knowledge, forged Mr. Sinkular's signature on the Amended Note.  The Debtor supports its assertion with a copy of the Amended Note, bearing the Members' signatures— which are undated—and Mr. Doddi's signature, which is dated July 13, 2020.  In further support of its assertion, the Debtor points to the recordation of the First Amendment to Deed of Trust on July 11, 2020, more than one year after Mr. Joshi delivered the document to Mr. Doddi and Mr. Bagaria via the July 2 Email.  Finally, the Debtor points to a letter it received from the Patel Law Group, dated July 29, 2020 (the "**Patel Letter**"), which states that the Amended Note was "executed by [Sunshine] and [the Debtor] as of July 1, 2020."

As will be discussed below, the ultimate determination of this case relies less on *when* the Amended Note was executed and more on *that* the Amended Note was executed.  Nevertheless, the Court finds that the evidence at trial—most particularly the only fully executed version of the Amended Note and the Patel Letter—most supports a finding that the Debtor executed the Amended Note in July of 2020.  The Patel Letter further stated that, as of July 29, 2020, the Debtor was in default under the Amended Note in the amount of $23,180.00 and that the Debtor had also

---

[13] The Court notes that the Trust is correct in its calculation: ($465,000.00 * 10%) / 12 = $3,875.00.
[14] Neither testimony nor documentary evidence sufficiently explained the increase in the payment amount.

defaulted by permitting the Property to become encumbered by a tax lien in favor of Dallas County. The Patel Letter provided that the Debtor could cure the default by delivering payment of $7,530.00 representing "outstanding monetary obligations" and $15,650.00 representing "costs and expenses for attorney's fees."

On September 10, 2020, Sachi A. Dave of The Patel Law Group, acting on behalf of Sunshine, filed a Notice of Foreclosure stating that the Property would be sold on October 6, 2020. The Debtor, thereafter, filed its voluntary petition under chapter 11 of the Bankruptcy Code on October 2, 2020 (the "**Petition Date**").

### C. Witness Credibility Determinations

As discussed above, the documentary evidence in this case is somewhat convoluted and opaque, in some instances providing clarity and in others only more confusion. The vast majority of the testimony at trial was based on competing recollections of oral conversations occurring several years in the past. Totally absent from the record are payment receipts, loan statements, or other contemporaneous records of payment activity and balances due at any given time.[15] Thus, the Court places a particular emphasis on the credibility of the witnesses in this case, as at times their testimony is the only record of what occurred for certain periods and events. The Court here notes again the Trust's Motion to Strike Testimony, in which the Trust requested that the Court strike *the entirety of Mr. Joshi's and Mr. Sinkular's testimony*. The Trust's Motion to Strike Testimony was denied by separate order entered contemporaneously herewith, as a motion to strike

---

[15] Both Mr. Joshi and Mr. Doddi testified at trial that it is not typical in their culture to request or provide receipts in the sorts of relationships at issue in this case. The Court's statement here is not in any way disparaging this cultural norm, but simply intended to highlight the importance of the testimony and, therefore, the witnesses' credibility considering the lack of documentation.

is not the proper vehicle by which to address witness credibility,[16] but it bears some discussion in these Findings of Fact and Conclusions of Law.

The Trust made the Court aware of its allegations as to inconsistent testimony between the Members' trial testimony and their depositions and filings in this case.  The Court is also aware, however, of some facts mitigating these inconsistencies.  For example, the Members have repeatedly and credibly testified that Enterprises ran, and continues to run, as a primarily cash-in, cash-out business with very little use of bank accounts or cash management systems.  Thus, the Members are largely without reliable documentary evidence for otherwise important figures, such as revenues and expenses.  To some extent, therefore, the Court would *expect* a certain degree of inconsistency in the Members' testimony, as they are primarily working from memory over the past *five years* of operating a business while wholly renovating the Property.

Thus, the Court wishes to make abundantly clear that, despite denying the Trust's Motion to Strike Testimony, the Court afforded proper weight to properly presented impeachment evidence during the Members' testimony and renders the following credibility determinations after careful consideration of the witnesses' testimony and any impeachment thereof.

### 1. Arpit Joshi

The Court finds that Mr. Joshi was generally a credible witness.  Mr. Joshi appeared to answer questions posed to him truthfully to the best of his recollection.  Although the Trust's counsel, on several occasions, noted that Mr. Joshi's trial testimony deviated from his prior deposition testimony and from the Debtor's filings in this case, the Court was not persuaded that

---

[16] *Munoz v. State Farm Lloyds*, Civil Action No. B-04-141, 2005 U.S. Dist. LEXIS 63006, at *5 (S.D. Tex. Dec. 15, 2005);  *see Susan Mueller v. Towers, Perrin, Forster & Crosby, Inc.*, Case No. 3:10-cv-1093 (WWE), 2010 U.S. Dist. LEXIS 113320, at *4 (D. Conn. Oct. 25, 2010) ("A motion to strike should not be addressed to false or misleading testimony."); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 33 (D.D.C. 2002) ("A motion to strike is not an appropriate vehicle through which to contest the credibility of a witness or to draw further attention to the fact that one piece of evidence is contradicted by another.").

these inconsistencies were indicative of a lack of credibility, but more attributable to slight failures of memory and a lack of detailed documentation of the activities of the Debtor and Enterprises over the preceding five years. Particularly tellingly, the Court was persuaded by Mr. Joshi's forthrightness in admitting that he forged Mr. Sinkular's signature on documents, including the Amended Note. The Court finds that Mr. Joshi otherwise testified credibly to the method by which he delivered payments to Sunshine, the circumstances surrounding various missed payments, and the execution of the Amended Note.

### 2. Raja Doddi

The Court likewise finds that Mr. Doddi was generally a credible witness. Mr. Doddi appeared to answer questions truthfully to the best of his recollection. The Court was concerned, however, with Mr. Doddi's apparent inability to authenticate documents which purported to be created by Sunshine and delivered to the Debtor. It was readily apparent that Mr. Doddi was a very "hands off" lender. Mr. Doddi expressed an extensive reliance on Mr. Bagaria for the data underlying and the preparation of much of the documentary evidence about which he was questioned.[17] In fact, Mr. Doddi admitted that the majority of conversations regarding the Original Note and the Amended Note occurred between Mr. Bagaria and the Members with little or no involvement from Mr. Doddi. Thus, although the Court finds that Mr. Doddi was generally credible, the Court cannot place a great deal of weight on his testimony.

### 3. Pawan Bagaria

The Court found Mr. Bagaria's testimony concerning. Again, Mr. Bagaria acted as an accountant or financial advisor of sorts to both Parties. Taken together, the other witnesses' testimony fairly painted Mr. Bagaria as an active intermediary between the two clients. The

---

[17] The Court would note that even legal bills in the name of Mr. Doddi or Sunshine often bore Mr. Bagaria's address.

testimony and documentary evidence at trial showed that Mr. Bagaria had significantly more contact with the Members than did Mr. Doddi. This fact underscores the Court's primary concern with Mr. Bagaria's testimony, namely, that it was often diametrically opposite of the Members' testimony *and*, additionally, inconsistent with Mr. Doddi's testimony. For example, Mr. Bagaria testified that his relationship with Sunshine and Mr. Doddi was limited to preparing Sunshine's tax return. Mr. Doddi, on the other hand, testified that most of the communication between the Debtor and Sunshine took place through Mr. Bagaria. Additionally, Mr. Joshi testified that negotiations for an additional $1.2 million loan from Sunshine occurred *primarily* through Mr. Bagaria. What was clear to the Court was that Mr. Bagaria, a purported certified public accountant, was "representing" two sides of a transaction in which he sometimes occasionally participated personally. In sum, the Court finds that the weight of the documentary evidence and other credible testimony falls against or rebuts Mr. Bagaria's credibility.

*4. Andy Sinkular*

The Court finds that Mr. Sinkular was a credible witness. Mr. Sinkular appeared to answer the questions posed to him truthfully to the best of his recollection. Mr. Sinkular exhibited intimate knowledge of the operations of the Debtor and Enterprises despite the lack of reliable documentation discussed above. Mr. Sinkular also exhibited intimate knowledge of the process of renovating the Property, as he testified that he has carried out much of the work on his own with the aid of intermittent contractors and other hired help. Mr. Sinkular provided the most comprehensive and cogent narrative of the events of this case about which he had knowledge. Of course, it cannot go without stating that the weight given to Mr. Sinkular's testimony must be tempered given that Mr. Sinkular admitted that most interactions regarding the Original Note and the Amended Note occurred between Mr. Joshi and Mr. Bagaria. Additionally, once again, the

crux of this case is Mr. Joshi's *concealment* of the execution of the Amended Note from Mr. Sinkular. Finally, the Court was not persuaded that the impeachment evidence with which Mr. Sinkular was challenged materially reduced his credibility.

*5. Selim Taherzadeh*

The Court finds that Mr. Taherzadeh was a credible witness. Mr. Taherzadeh's testimony related primarily to how the Trust came to be involved in this case. Mr. Taherzadeh testified briefly to his knowledge, as the Trust's trustee, of the Debtor's payment history. The Court ultimately finds Mr. Taherzadeh's testimony, though credible, to be largely immaterial to the relevant issues in this case given that the Trust purchased the Amended Note after the Petition Date.

## IV.  <u>CONCLUSIONS OF LAW</u>

Despite the extensive and winding factual background underlying this case, the legal questions at issue are relatively simple. The Parties essentially call on this Court to determine whether Mr. Joshi's forgery of Mr. Sinkular's signature on the Amended Note renders that document unenforceable against the Debtor. The Debtor argues that the only enforceable document in existence in this case is the Original Note.[18] The Trust, on the other hand, argues that the Amended Note is the operative loan document and that the Debtor is liable for the full principal thereunder, in addition to interest, expenses, and fees incurred after its execution.

The enforceability of a contract is a matter of state law. *Delta Marina, Inc. v. Plaquemine Oil Sales, Inc.*, 644 F.2d 455, 458 (5th Cir. 1981) (citing *Kelly v. Kosuga*, 358 U.S. 516, 519 (1959)). Under Texas law, "a promissory note is a contract evincing an obligation to pay money."

---

[18] The Debtor appears to admit, however, to several debts arising after the execution of the Original Note, raising the amount due from the Debtor to Sunshine from $300,000.00 (*i.e.*, the principal amount of the Original Note) to $365,000.00. As will be discussed below, the Court concludes that the Amended Note *is* enforceable against the Debtor, thus the principal of the Original Note is moot.

*Ji Maddox Props., LLC v. WEM Equity Capital Invs., Ltd.*, 446 S.W.3d 126, 132 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Thus, the Court will apply Texas law to determine whether the Amended Note, executed by Mr. Joshi, is enforceable against the Debtor.

Under the Texas Business Organizations Code (the "**TBOC**"), "[a]n act committed by an agent of a limited liability company . . . for the purpose of apparently carrying out the ordinary course of business of the company, including the execution of an instrument, document, mortgage, or conveyance in the name of the company, binds the company." TBOC § 101.254(b). Excepted from this rule are acts meeting each of the following criteria: (1) the agent does not have actual authority to act for the company and (2) the person with whom the agent is dealing has knowledge of the agent's lack of actual authority. *Id.* § 101.254(b)(1)–(2); *see Badman Holdings, LLC v. Xie*, No. 05-15-01379-CV, 2016 Tex. App. LEXIS 11984, at *10 (Tex. App.–Dallas [5th Dist.] Nov. 4, 2016, no pet.) (holding that each of the criteria under TBOC § 101.254(b) is required to invalidate an act by an agent of a limited liability company).

The TBOC defines an "agent" of a limited liability company as "each governing person . . .and each officer . . . vested with actual or apparent authority by the governing authority of the company." TBOC § 101.254(a). In turn, the TBOC defines a "governing person" as "a person serving as part of the governing authority of an entity." *Id.* § 1.002(37). The "governing authority" is defined as the managers of the limited liability company, if the company's certificate of formation states that the company will have managers, otherwise the governing authority is the members of the company. *Id.* § 101.251.

The Debtor's Certificate of Formation provides that the Debtor will not have managers and that the Members will manage the Debtor.[19] Thus, the Members represent the governing authority

---

[19] The Debtor's Certificate of Formation was admitted into evidence at the trial as the Trust's Exhibit 49 without objection.

of the Debtor. *Id.* § 101.251. Likewise, each Member was a governing person and, therefore, an agent of the Debtor. *Id.* §§ 1.002(37), 101.254(a). Further bolstering this conclusion, the Members' testimony at trial confirmed that, until recently, Mr. Joshi's title with the Debtor was "President" and Mr. Sinkular's title was "Vice President," with the gentlemen swapping their titles sometime after the Petition Date. Thus, the Court concludes that Mr. Joshi was undoubtedly an agent of the Debtor at the time that he executed the Amended Note.

The Court further concludes that Mr. Joshi had actual authority to bind the Debtor. Neither Party disputed Mr. Joshi's actual authority to execute the Amended Note. Neither Party presented the Court with evidence raising any question as to Mr. Joshi's actual authority. The Debtor's Certificate of Formation is silent as to the Members' authority, other than their authority to indemnify and to purchase indemnification insurance. The record does show, however, that Mr. Joshi was entrusted with negotiating lending arrangements on behalf of the Debtor and making loan payments on behalf of the Debtor.[20] In the absence of any evidence to the contrary, the Court concludes that Mr. Joshi had actual authority to execute the Amended Note on behalf of the Debtor. Thus, pursuant to the TBOC, because Mr. Joshi was an agent of the Debtor with actual authority to execute the Amended Note, Mr. Joshi's signature thereon bound the Debtor to the terms of the Amended Note. TBOC § 101.254(a), (b).

The Court finds that the analysis of this point is highly analogous to the analysis in *Badmand Holdings, LLC v. Xie*. In that case, one of the two members of a member-managed limited liability company, without the knowledge or consent of the other member, posted a condominium owned by the company for sale through a real estate broker. 2016 Tex. App. LEXIS 11984, at *1–2. The defendant agreed to purchase the condominium, but at closing, the company,

---

[20] Mr. Sinkular credibly testified that Mr. Joshi was primarily responsible for the lending arrangement with Sunshine as the arrangement came about through Mr. Joshi's relationship with Mr. Bagaria.

through its members, refused to perform, alleging that the contract for sale of the condominium was not enforceable. *Id.* at *3. The company argued primarily that the member posting the condominium for sale lacked actual authority to sell it. *Id.* at *9. The *Badmand* court held that the evidence at trial showed that the member, despite being an agent of the company, lacked actual authority to sell the condominium, but that the defendant did not have knowledge of the member's lack of authority. *Id.* at *10–11. Thus, the *Badmand* court upheld the trial court's judgment ordering specific performance under the contract to sell the condominium. *Id.* at *11.

Here, the Court need not delve even as deep as the *Badmand* court, as the facts establish definitively that Mr. Joshi was an agent with actual authority to bind the Debtor by executing the Amended Note. Thus, the only remaining question for the Court is what effect, if any, the forgery of Mr. Sinkular's signature on the Amended Note has on its enforceability.

The Debtor baldly asserts in the Complaint that Mr. Joshi's forgery of Mr. Sinkular's signature on the Amended Note renders that instrument unenforceable against the Debtor. Complaint, ECF No. 1 ¶ 43 ("The Debtor would show that [the Original Note] is the only valid not executed by the Debtor."). The Debtor offered some argument in closing that Mr. Joshi was deceived into signing the Amended Note for "tax purposes" and under threat of imminent foreclosure, but only did so in rebuttal of Mr. Joshi's *apparent* authority to execute the Amended Note. As previously discussed, the Debtor wholly failed to argue or put on evidence that Mr. Joshi lacked *actual* authority to bind the Debtor. Instead, the Debtor further argued in closing that the Amended Note required the signature of Mr. Sinkular because there were two signature blocks on the document. The Debtor did not, however, provide the Court with any authority providing that the number of signature blocks on an instrument is determinative of which signatures are necessary to bind a limited liability company.

On the contrary, the Court finds poignant analogy in the state court case of *Community Trust Bank v. All Service Electrical Contracting, L.L.C.*  In that case, the Court of Appeal of Louisiana was called upon to determine whether, under Louisiana law, a promissory note was enforceable against the defendant, a Louisiana limited liability company, notwithstanding the forgery of one member's signature by the other sole member.  Case No. 54,130-CA, 2021 La. App. LEXIS 1733, at *1–2 (La. Ct. App. Nov. 17, 2021).  The court applied Louisiana Revised Statute § 12:1317 which provides, similarly to the TBOC, that "[e]ach member . . . is a mandatary[21] of the limited liability company for all matters in the ordinary course of its business."  *Id.* § 12:1317(A); *Community Trust Bank*, 2021 La. App. LEXIS 1733, at *7.  The court ultimately found that the promissory note was enforceable against the defendant because the signing member, despite her forgery of her business partner's signature, had authority to bind the defendant alone, thus the forged signature was "superfluous and unnecessary" to the enforceability of the note.  *Community Trust Bank*, 2021 La. App. LEXIS 1733, at *8.  Likewise in this case, Mr. Joshi had authority under the TBOC and the Debtor's Certificate of Formation to bind the Debtor to the Amended Note on his own, rendering the forgery of Mr. Sinkular's signature similarly superfluous and unnecessary to the enforceability of the Amended Note.[22]

Thus, in the absence of evidence or argument proving otherwise, and pursuant to the Texas law summarized above, the Court is left with the conclusion that Mr. Joshi's signature, alone, was sufficient to bind the Debtor, a Texas limited liability company, to the terms of the Amended Note. Because Mr. Joshi could have bound the Debtor alone, the Court concludes that the fact of Mr. Joshi's forgery of Mr. Sinkular's signature, though deeply troubling from a personal and business

---

[21] In Louisiana, a "mandatary" is a person to whom authority is conferred to transact affairs on behalf of the business, akin to an agent.  *In re Quinlivan*, 347 B.R. 811, 818 (Bankr. E.D. La. 2006).

[22] *See* Tex. Bus. & Com. Code § 3.403 (providing that an unauthorized signature remains enforceable against the actual signer as to a person who in good faith pays the instrument or takes it for value).

perspective, has no relevance on the enforceability of the Amended Note with regard to the Debtor. The Debtor, therefore, became obligated to Sunshine in the amount of $465,000.00[23] effective as of July 1, 2019 according to the terms of the Amended Note.[24]

The Court was not presented with admissible documentary evidence regarding the Debtor's payment activity after July 29, 2020. Thus, the Court is again tasked with piecing together the appropriate balance remaining under the Amended Note as of the Petition Date. As an initial matter, the Court sustains the Debtor's objection as to the entirety of the $15,564.05 in attorney's fees claimed in the Proof of Claim. The evidence and testimony at trial revealed that, at various times, these fees included attorneys' fees billed to entities other than Sunshine (including at least one entity allegedly owned by Mr. Bagaria's spouse) and included attorneys' fees for the preparation of various documents bearing no relation to the Original Note, the Amended Note, or collection efforts thereon. Accordingly, such amounts are disallowed.

Next, focusing on the payment activity and alleged lack thereof, the Court first finds that the Trust must proverbially sleep in the bed it made when it purchased Sunshine's rights and obligations under the Amended Note. "It is axiomatic that an assignee walks in the shoes of his assignor." *Irrigation Ass'n v. First Nat'l Bank*, 773 S.W.2d 346, 348 (Tex. App.–Dallas [5th Dist.] 1989, writ denied). The Trust, in this case, purchased a note from a prior owner and counterparty that kept virtually no records. Perhaps, the "best" evidence the Trust presented as to the proper balance was the Patel Letter, about which the Court holds a fair amount of skepticism. The Court

---

[23] The Court notes that there was significant conflicting testimony as to the correctness of the $465,000.00 principal amount pursuant to the Amended Note. Although the Court does not necessarily agree that the Debtor likely owed Sunshine $465,000.00 as of July 1, 2019 based on the evidence, the Court cannot pierce through the terms of a signed promissory note at this juncture. This is not an action brought pursuant to chapter 5 of the Bankruptcy Code. Mr. Joshi, a duly authorized agent, should not have signed the Amended Note if it was incorrect as to the principal amount.

[24] As discussed above, the record was devoid of documentary evidence that the Amended Note was executed in 2019, and the weight of the remaining documentary evidence and testimony supported the Court's finding that the Amended Note was executed in July of 2020. Nevertheless, by its terms, payments were to begin on July 1, 2019, and such payments were in fact made by the Debtor.

is left with serious questions about the accuracy of the Patel Letter, which states that the Debtor was allegedly in monetary default of $7,530.00 under the Amended Note as of July 29, 2020, without any explanation.  The same document, however, provides that the Amended Note was effective only as of July 1, 2020.  The Court must ask: how could the Debtor have been behind $7,530.00 less than one month after the execution of the Amended Note?[25]  Moreover, the exhibit offered by the Trust to back up its Proof of Claim amount fails to match the arrearages set forth in the Patel Letter.[26]

On the other hand, Mr. Joshi testified that the Debtor was current under the Amended Note as of August of 2020.  However, his testimony never reflected that the Debtor was making principal *and* interest payments beginning in January 2020, which would have been $4,487.35 using the terms of the Amended Note ($465,000.00 principal with a 20-year amortization at an annual rate of interest of 10%).  Neither Party retained an independent accountant to testify or even run a proper loan calculation for the Court, if one can even be run with *no documentary backup*.  Thus, the Court is left with the trying and unenviable task of determining the proper amount of the Trust's claim.  Based upon the totality of the evidence, the Court finds and concludes that the amended Proof of Claim is allowed as a secured claim in the amount of $495,083.82 as of the Petition Date (which amount includes the $19,391.36 in taxes paid to the City of Dallas).[27]

Finally, the Court concludes that, based on a totality of the evidence, the Trust failed to carry its burden as to its asserted affirmative defenses of mutual mistake, estoppel, unclean hands, ratification, and laches, and the same are hereby overruled.

---

[25] The Court notes that it was entirely defeated in its attempts to justify or recalculate the alleged delinquency, even after performing its own amortization according to the terms set forth in the Amended Note.

[26] The Trust's exhibit 52 was not admitted as an exhibit but does coincidentally provide the Trust's calculation of its Proof of Claim.

[27] The Trust has waived its respective rights to claim additional interest, fees, or other charges on the loan accruing prior to the Petition Date, and the Debtor has waived its right to claim any additional payments made prior to the Petition Date.

## V. __CONCLUSION__

The Debtor, in challenging the ultimate enforceability of the Trust's claim under the Amended Note, simply failed to carry its burden. The Court sympathizes with Mr. Sinkular, who the evidence showed was repeatedly kept in the dark despite extensive personal investment— monetarily and physically—in this business venture. Nevertheless, the evidence in this case, as sparse as the documents may have been, shows that the Debtor is bound by the terms of the Amended Note. Mr. Joshi signed the Amended Note in his capacity as President and agent of the Debtor. Mr. Joshi's *actual* authority to execute the Amended Note was not meaningfully challenged during the trial. Thus, under Texas law, Mr. Joshi's signature alone would have been sufficient to bind the Debtor. Mr. Joshi's decision to forge Mr. Sinkular's signature on the document, although reprehensible, had no effect on Mr. Joshi's authority to bind the Debtor on his own.[28] Thus, the terms of the Amended Note, including the increased principal amount of $465,000.00 and the annual interest rate of 10%, were enforceable against the Debtor as of July 13, 2020. The Court therefore concludes that the Trust's Proof of Claim should be allowed in the amount of $495,083.82. As set forth herein, judgment will be entered in favor of the Trust, with each Party bearing its own costs and attorneys' fees.

### ### END OF ORDER ###

---

[28] Of course, if any personal guaranty was fraudulently signed on behalf of Mr. Sinkular, it is unenforceable and has no effect.